**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| | ) | Criminal No.: 2:07-1122-PMD |
| v. | ) | |
| | ) | |
| Brandon Ontrell Williams | ) | **ORDER** |
| and Stacy Renee Williams, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This matter is before the court upon several motions. First, Defendant Brandon Ontrell Williams ("Mr. Williams") filed two Motions to Suppress and a Motion in Limine. Defendant Stacy Renee Williams ("Ms. Williams") filed a Motion to Suppress Evidence and a Motion to Exclude Polygraph Examination. A hearing was held on October 23, 2008 at 11:00 a.m.

## BACKGROUND

On January 8, 2007, the Summerville Police Department received information from Sergeant Mike Williams of the Berkeley County Sherriff's Office that an anonymous caller had provided information regarding the presence of narcotics in a tube located in one of two vehicles at 102 Shamrock Drive, Summerville, South Carolina. The caller identified the two cars as a Ford Explorer and a green sedan and stated that an unknown person would come to the house and pick up one of the cars. Based on this information, Sergeant William Driggers Jr. of the Dorchester-Summerville Narcotics Unit assembled a team of officers to surveil the home. Upon arrival, the officers found a Ford Explorer and a four-door Buick in the driveway of the residence, and soon thereafter, a female, later identified as Stacy Williams, arrived at the house. Eventually, Ms. Williams got into the green Buick and drove off. One of the officers surveilling the house radioed Corporal Tim Jones to inform him of Ms. Williams' departure in the Buick.

While driving in the direction of the house's location, Corporal Jones spotted the vehicle and observed Ms. Williams talking on her cell phone and not wearing a seat belt. He alleged to have a clear an unobstructed view of Ms. Williams and noticed the seat belt buckle hanging by the driver's side window. Corporal Jones initiated a traffic stop against Ms. Williams for a seat belt violation, which a video camera in his patrol car recorded.

Ms. Williams pulled over in a gas station and was the sole occupant of the car. Corporal Jones radioed other officers for back up, and within minutes, several officers arrived at the scene. When Corporal Jones approached the driver's side of the car, Ms. Williams was speaking with someone on her cell phone. Corporal Jones asked her to hang up but the other person terminated the phone call before she could. He proceeded to explain the violation to Ms. Williams and asked for proof of insurance and registration. Ms. Williams tried opening the glove box with the ignition key to retrieve these documents but failed to open it. While she attempted to open the glove box, Corporal Jones observed her messing with an unidentified object near or under her purse, which was located in the passenger's seat, and recognized an "overpowering" smell of green marijuana coming from the vehicle. Unsure of what Ms. Williams was doing with her purse, Corporal Jones asked Ms. Williams to step out of the car and open the glove box from the passenger's side of the vehicle. When Ms. Williams opened the door to exit the vehicle, Corporal Jones observed loose marijuana stems and seeds both on the floor and inside-door panel. Once on the passenger's side of the vehicle, Ms. Williams continued to have trouble opening the glove box and explained that the car belonged to a family member who asked her to take it to the gas station. Ms. Williams became visibly nervous, as she was shaking and had labored breathing.

When Ms. Williams finally opened the glove box and retrieved the proof of insurance and registration, Corporal Jones asked her to get back out of the vehicle. She initially did not

follow his orders, but instead, attempted to shove a black bag in the glove box before she closed it. Because of the way Ms. Williams positioned the black bag in the glove box, it prevented the glove box from closing. She repeatedly tried to slam the door shut but to no avail. As the detention progressed, Corporal Jones noticed that Ms. Williams' nervous demeanor escalated. She had a hard time breathing, and when she did finally exit the passenger's side of the vehicle, Corporal Jones had to help her sit down. He asked her what was in the black bag, and she responded she did not want to get into trouble. Based on her nervous demeanor, unwillingness to promptly follow his orders to exit the vehicle, her attempts to shove the black bag into the glove box, the overpowering smell of green marijuana, and the presence of loose stems and seeds in the car, Corporal Jones placed Ms. Williams in handcuffs and looked into the black bag. At this point, Corporal Jones read Ms. Williams her *Miranda* rights. As he looked into the bag, Ms. Williams yelled out, "Oh my Lord," and fell to her side. Corporal Jones called for an EMS, and they responded but did not transport Ms. Williams from the scene. Inside the black bag, Corporal Jones recognized marijuana and crack cocaine in loosely sealed plastic bags.

Meanwhile, the officers located at 102 Shamrock Drive obtained a search warrant. The warrant's "Description of Premises To Be Searched" stated, "Better described on Affidavit." The affidavit accompanying the warrant described 102 Shamrock Drive as a premise to be searched, as well as "any persons on premises [and] vehicles belonging to persons on premises . . . ." A search of the Ford Explorer remaining at the residence uncovered a cylinder-shaped sports cooler which contained four one-gallon bags of green marijuana, a one-gallon bag with smaller bags of powder and crack cocaine, and a loaded firearm. A fingerprint analysis of one of the plastic bags containing drugs revealed a print identified as belonging to Defendant Brandon Williams. Both the residence and Ford Explorer are registered to Julie Williams, the mother of Mr. Williams. On

January 9, 2008, Julie Williams contacted the police to inquire about the search of her home and car. She stated that Mr. Williams did not live with her and that her Ford Explorer did not work, which is why she used it for storage. She did, however, state that Mr. Williams used the Buick that Corporal Jones arrested Ms. Williams driving. On March 6, 2008, Mr. Williams turned himself into the police.

## ANALYSIS

### I.    Defendant Brandon Williams' Motions

#### A.  Motion to Suppress Statements Made at Hospital on January 7, 2007

Prior to the hearing, the Government thought it possessed a waiver of *Miranda* rights signed by Mr. Williams. Mr. Williams denies ever signing such a form, and at the hearing, the Government stipulated that the form was actually signed by a Brandon Nix, who was arrested between the period of January 7 and 8, 2008 in connection with a shooting and murder at a nightclub in North Charleston, South Carolina on January 7, 2008. Any statement the Government obtained from Mr. Williams at a hospital on January 7, 2008 concerned this shooting and did not have any relationship to the discovery of narcotics at 102 Shamrock Drive in the town of Summerville on January 8, 2008. The Government also stated that it had no present intention of using any statements taken at the hospital during trial. Thus, the court finds that any statements made by Mr. Williams are deemed irrelevant to this matter, rendering this motion moot.

#### B.  Motion to Suppress Evidence found in Ford Explorer

Mr. Williams moved the court to suppress evidence found by police in a search of a Ford Explorer owned by his mother and parked in her driveway. The Government asserts that Mr. Williams does not have standing to contest the constitutionality of the search of his mother's car.

The Fourth Amendment states, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. CONST. amend. IV. This Amendment protects against unreasonable searches and seizures by government officials. *United States v. Jarrett*, 338 F.3d 339, 344 (4th Cir. 2003); *see also Coolidge v. New Hampshire*, 403 U.S. 433, 487 (1971). Generally, "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas v. Illinois*, 439 U.S. 128, 134 (1978). The "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection . . . has a legitimate expectation of privacy in the invaded place." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (quoting *Rakas*, 439 U.S. at 143). A search can therefore be unconstitutional with respect to one person, yet the evidence obtained therefrom admissible against a second person. *United States v. Gray*, 491 F.3d 138, 144–45 (4th Cir. 2007).

At the hearing, Mr. Williams' counsel cited *Minnesota v. Carter* and provided the court with several other cases,[1] none from the Fourth Circuit, for the proposition that a person can have a reasonable expectation of privacy in a home when certain factors exist to show a connection

---

[1]  Mr. Williams' counsel provided the court with: *United States v. Bowden*, 380 F.3d 266 (6th Cir. 2004) (finding defendant had a reasonable expectation of privacy in father's home and garage when defendant had familial ties to the homeowner and maintained a permanent bedroom at the house in which he occasionally spent the night); *United States v. Rhiger*, 315 F.3d 1283 (10th Cir. 2003) (finding defendant had a reasonable expectation of privacy in a house that he regularly visited, entered unannounced, spent the night, and napped); *United States v. Heath*, 259 F.3d 522 (6th Cir. 2001) (finding that defendant had a reasonable expectation of privacy in his cousin's home based on his familial connection to the homeowner, his possession of a key to enter the house, and that he spent the night once a week for at least two years); and *United States v. Pollard*, 215 F.3d 643 (6th Cir. 2000) (finding that defendant had standing to challenge search of home when he had been friends with the home's lessee for seven years, occasionally spent the night and ate meals at the home, kept personal belongings at the home, and had a makeshift method to open the door to the home).

between a defendant and a household. In *Minnesota v. Carter*, the Supreme Court held that visitors who were "essentially present for a business transaction" had no legitimate expectation of privacy in the apartment of a third party. *Carter*, 525 U.S. at 90. Like *Carter*, the additional cases cited by Mr. Williams to support his standing to challenge the search of his mother's Ford Explorer deal with a defendant's expectation of privacy in the home of a third person. None of the cases conclude that a person may have a reasonable expectation of privacy in a car owned by another and located on the premises of that third party.

In this case, Mr. Williams proffered that he visited his mother at the home, occasionally ate meals at his mother's home, had clothes at the home, and had the freedom to enter the home. Even if Mr. Williams could prove these facts, they do not show he had a reasonable expectation of privacy in the Ford Explorer present in his mother's driveway. While the Supreme Court has expressly left open the issue of "whether the same expectations of privacy are warranted in a car as would be justified in a dwelling house in analogous circumstances," it has also stated that "cars are not to be treated identically with houses or apartments for Fourth Amendment purposes." *Rakas v. Illinois*, 439 U.S. 128, 148 (1978). Furthermore, Sergeant Driggers testified that Julie Williams, who owned the Ford Explorer, stated that Mr. Williams used the Buick but said nothing about his use of the Ford Explorer. Since nothing indicates Mr. Williams had a property or possessory interest in the car, the court finds that Mr. Williams does not have a reasonable expectation of privacy in, and therefore lacks standing to contest the constitutionality of the search of, the inoperable Ford Explorer owned by his mother and parked in her driveway.

### C.  **Motion in Limine**

Mr. Williams also moves the court, pursuant to Fed. R. Evid. 403, 404, 405, and 609, to prevent the Government from using the following evidence at trial on the grounds that it would be highly prejudicial and is irrelevant to the proof of the charges Mr. Williams faces:

### 1.  Prior Arrests and/or Convictions of Mr. Williams

At the hearing, the Government agreed to handle this subject matter by way of Mr. Williams' stipulation that he is a convicted felon rather than presenting evidence of past convictions to the jury. The court agrees with proceeding in this manner.

### 2.  Mr. Williams' Reputation for Criminal Activity

The Government stated that it did not intend to introduce any evidence concerning Mr. Williams' reputation for other criminal activity in its case-in-chief. The court accepts this stipulation.

### 3.  Any Evidence under Fed. R. Evid. 404(b), particularly any past involvement of Mr. Williams with drugs or guns

The Government informed the court that it already has one statement by someone who purchased narcotics from Mr. Williams close to the date that the police uncovered his fingerprints on drugs found at 102 Shamrock Drive and that it planned to use this statement in its case-in-chief. The Government also stated that it would continue to seek similar statements. Because the Government continues to develop its case and seek out similar statements, the court continues this motion and will rule on these matters prior to trial.

### 4.  Statements made by Mr. Williams while in Custody

The Government also informed the court that a cellmate of Mr. Williams voluntarily offered to testify as to statements made by Mr. Williams regarding his involvement with narcotics located at 102 Shamrock Drive. Mr. Williams' counsel was not made aware of this

evidence until the morning of the hearing pertaining to this motion. Similar to the ruling above, the court continues this motion and will rule on these matters prior to trial as Mr. Williams' counsel has not had time to respond to this evidence and the Government continues to develop its case.

II.    **Defendant Stacy Williams' Motions**

    A.  **Motion to Suppress Evidence Found in Buick Pursuant to a Traffic Stop**

    Ms. Williams moved the court to suppress drugs found by police inside the Buick that she was driving when stopped for a seat belt violation. She bases her argument on the belief that Corporal Jones exceeded the scope of his authority in violation of her constitutional rights when he searched the vehicle during her traffic stop for a seat belt violation.

    First, Ms. Williams challenges Corporal Jones' belief that he had probable cause to conduct a traffic stop based on a seat belt violation because of his limited opportunity to view whether or not she was wearing her seat belt. Section 56-5-6520 of the South Carolina Code requires drivers or occupants to wear a complying, fastened safety belt when the motor vehicle in which they are riding is being operated on the public streets and highways of South Carolina. A law enforcement officer may pull over or stop a vehicle when the officer has probable cause of a seatbelt violation based on a clear and unobstructed view of someone within the vehicle who is not wearing a seatbelt. S.C. Code Ann. § 56-5-6540(E). Ms. Williams' counsel played the in-car video of Corporal Jones' stop to illustrate that he could not have had a clear and unobstructed view of the interior of Ms. Williams' car and, therefore, could not have recognized a seat belt violation. At the hearing, Corporal Jones testified that, while on Highway 78 and getting ready to make a right-hand turn onto North Maple Street in Summerville, he spotted Ms. Williams turning right from North Maple Street onto Highway 78. This would have put her directly in Corporal

Jones' view, and he testified that he saw her talking on the cell phone and not wearing her seat belt because he noticed the buckle hanging by the driver's side window. Although the video camera in Corporal Jones' patrol car does make it difficult to see whether or not a seat belt was being worn, it is not a high-quality video, and the court believes that Corporal Jones' testimony establishes that probable cause existed to stop Ms. Williams for a seat belt violation.

Second, Ms. Williams argues that because S.C. Code Ann. § 56-5-6540(D) does not permit a police officer to conduct, or request consent to, a search of a vehicle based on a seat belt violation, Corporal Jones had to have probable cause to search the Buick and the black bag found in the car driven by Ms. Williams. She challenges his belief that probable cause existed on the grounds that the incident reports inconsistently stated where Corporal Jones saw loose marijuana in the Buick, that the government never admitted into evidence the loose marijuana that he claimed to have seen, and that he could not have smelled green marijuana because the drugs that were seized after a search of the vehicle were packaged in two sealed plastic bags that were located in a larger black plastic bag on the opposite side of the car from where Corporal Jones stood. Thus, Ms. Williams asserts that Corporal Jones really relied on the anonymous informant's information about the drugs in the Buick to stop Ms. Williams and search the car.

At the hearing, Corporal Jones testified that he is a corporal supervising K-9 units and, thus, deals with the training and handling of police dogs in narcotics investigations. When he waited for Ms. Williams to retrieve proof of insurance and registration, he smelled an overpowering odor of green marijuana coming from the car and noticed her fondling something near her purse on the passenger's seat. Corporal Jones testified that he asked Ms. Williams out of the Buick to open the glove box from the passenger's side of the car so he could see into the vehicle and recognize any safety issues that may have existed. Once a vehicle has been lawfully

detained for a traffic violation, it is reasonable for police officers to order the driver out of the vehicle for safety purposes. *Pennsylvania v. Mimms*, 434 U.S. 106, 111–12 (1977); *see also Maryland v. Wilson*, 519 U.S. 408 (1997) (holding that an officer may also order passengers out of a car that is subject to a valid traffic stop). Although Corporal Jones testified that he did not think Ms. Williams was armed, an "officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry v. Ohio*, 392 U.S. 1, 27 (1968). Because Corporal Jones believed Ms. Williams' conduct of fondling an unidentified object near her purse on the opposite side of the car and out of his view created a safety issue, the court finds Corporal Jones did not exceed his authority in asking Ms. Williams out of the Buick to open the glove box from the passenger's side.

When Ms. Williams exited the car, Corporal Jones noticed loose marijuana stems and seeds present on both the floor of the car and the panel of the door. While on the passenger's side of the vehicle, she persisted in using the wrong key to open the glove box, and once she did open it, attempted to shove the black bag into the glove box after Corporal Jones asked her back out of the vehicle. Her labored breathing and inability to stand on her own constituted an overreaction to a simple seat belt violation, and when asked what was in the black bag, she responded, "I don't want to get in trouble." All of the foregoing factors gave Corporal Jones reasonable suspicion rising to the level of probable cause to search the Buick and the black bag, where he discovered several loosely-packaged bags of marijuana and crack cocaine. Therefore, the court finds that Corporal Jones did not exceed his authority in conducting the traffic stop of Ms. Williams and denies Ms. Williams' motion to suppress this evidence.

**B.  Motion to Exclude Polygraph Examination**

Ms. Williams also moved the court to preclude the Government from presenting evidence that Ms. Williams took a polygraph examination and any results generated from it. The Government stated it did not expect to use any evidence concerning the polygraph examination but may opt to present evidence of Ms. Williams' responses to a pre-polygraph interview conducted by an officer to help construct questions for the polygraph examination. Ms. Williams' counsel objected that such evidence could only be used for impeachment purposes, but the court disagrees. Ms. Williams had been read her *Miranda* rights prior to the pre-polygraph interview, and any questions asked prior to the polygraph constituted part of the polygraph protocol to which Ms. Williams knowingly and voluntarily agreed. *United States v. Wright*, No. 96-4451, 1997 U.S. App. LEXIS 29798, at *3 (4th Cir. 1997) (affirming a district court's denial of defendant's motion to suppress statements made during a pre-polygraph interview when defendant signed a written waiver of rights form prior to the pre-polygraph interview); *United States v. Rozelle*, No. 93-5713, 1994 U.S. App. LEXIS 35122, at *16 (4th Cir. 1994) (finding no error in admitting statements made in a pre-polygraph examination interview when defendant waived his right not to be a witness against himself).

<u>**CONCLUSION**</u>

For the foregoing reasons, it is therefore **ORDERED** that Defendant Brandon Williams'

Motions to Suppress Statements and Evidence are **DENIED**. Parts three, four, and five of Mr.

Williams' Motion in Limine are **CONTINUED**. Stacey Williams' Motion to Suppress Evidence

is **DENIED**, and her Motion to Exclude Polygraph Examination is **GRANTED** only to the

extent stated in this order.

**AND IT IS SO ORDERED**.

PATRICK MICHAEL DUFFY
United States District Judge

**Charleston, South Carolina**
**November 6, 2008**